The next case we will hear is IQ Dental Supply v. Henry Schein, Inc. Good morning, Lawrence Fox, Duane Morris for Plaintiff Appellant IQ Dental. I want to go straight to the antitrust injury ruling, because I think that's really at the heart of the matter. The district court held that IQ did not allege an antitrust injury because IQ replaced two other distributors who had been selling through these websites, the Source One Dental Association websites, and were driven off by the defendant's antitrust conspiracy. Assuming that IQ would not have become a seller through those websites, if the prior competitors had not been driven off... Is there some limit to the number of sellers that can operate on this website? There were two. Why couldn't there have been three? There could have been. So why would the driving off of the other two be necessary for your client to step in? This was done contractually. My client had to get permission to sell through those websites. From Source One. From Source One. And it got that permission, got that... There was a market distortion that might have helped your client. Your saying, presumably, is not decisive of the question of whether there was an antitrust injury. Precisely, Your Honor. You're saying that, I think, that however he gets into the market, there's a — and if he's injured afterwards in a manner in which the antitrust laws are prepared to recognize as an antitrust injury, there's an antitrust injury. Now, it may be that there could be an offset. We don't know. It may be that damages might be mitigated in some way. But you're saying that there's still an injury, at least for the threshold question, of whether there's an antitrust injury. Exactly correct. Why — when you go to the enforcement side of it, that's where I think you run into a little more difficulty. Because why aren't you, in effect, a derivative plaintiff? Source One is the one who's really being attacked here in the antitrust conspiracy alleged, not your client. Correct? The pressure was applied most directly to Source One. Correct. That doesn't mean that... Isn't Source One a better plaintiff than you? I don't believe so, Your Honor. Under those circumstances? In fact, the way... Why are you a better plaintiff? Well, first of all... Or why are you as good a plaintiff? We are as good a plaintiff. First, the notion that our injury is derived from Source One's injury simply is factually incorrect. Well, the damages are different. They got — they lost commissions. You lost lost profits. Correct. That's your point, I guess. No. My point is also this. IQ sold the product. IQ received the orders. They filled the orders from inventory. They shipped the product. And they received the revenue. They then, as Your Honor pointed out, they then paid a commission. So they are the direct competitor. They are the ones who are directly injured. And if anyone's injury is derivative of anybody else's, Source One's commission is derivative of IQ's sales. Well, except... So at the very least, at the very least, counsel, you are the best plaintiff for IQ's injuries. Is that correct? I mean, that's your argument. Well, we're the only competitor who has brought a lawsuit. And competitors are favored... Isn't Source One also suing in the Eastern District? Yes, but Source One is not per se a competitor. No, aren't the dentists suing? The dentists have sued, although there's been an announcement of a settlement in recent days. Now, you said that the two suppliers that were, as it were, driven out of business, they haven't sued. That's correct. And now they can't. But how do we, should we decide? Statute of limitations as well. But, I mean, do we have to wait for the statute of limitations to run in order to find out whether a particular plaintiff would be an efficient enforcer? If there are others out there who would be more efficient enforcers and they don't and they can bring a claim or not bring a claim, that doesn't sort of promote somebody who's not an efficient enforcer to efficiency. Again, I think this whole, the whole discussion of who's better, who's best, who's most efficient is a bit of a red herring. Unfortunately, this red herring has somehow found its way into the jurisprudence of this Court. Except as multiple courts, as multiple courts have said, there are no cases in which someone is a truly suitable plaintiff and has been denied standing because someone else is also suitable. Let me ask you this, maybe, and this might help. Are there any other potential plaintiffs out there who can claim lost profits, who could still sue? Let's put it this way. After the initial competitors, the initial sellers were driven out. IQ. I'm excluding them. I understand. They're out. I understand. IQ, as we allege, has been responsible for 90 percent of the sales through those websites. So there may be other competitors, other sellers who comprise that other 10? There's commissions on the part of IQ. Correct. The dentists are going to say the prices were too high, so that's a different measure of damages. I'm talking about lost profits. Are there other plaintiffs? Again, IQ is 90 percent of the sales through that website. So I don't want to say that there's nobody else. On the other hand, those sales. I see. Well, the initial sellers, the folks you replaced, that your client replaced, their claim, if they asserted it, would be for lost profits during the time that they were a subject to this market distortion, plus what they would have earned if they had not been driven out of business, which is almost exactly what your claim would be. Am I correct? If those original sellers had sued. They aren't imaginary. Okay? They haven't sued, but they're not imaginary. They're people who could plausibly have alleged that they lost sales because of the market distortion, and they were driven out of business, and then they would claim lost profits going forward, which are exactly the same profits that you're going to be claiming. Again, Your Honor, it's not just that they haven't sued. It's that they no longer can. And that's not insignificant. Wait until the statute of limitations has run in order to find out who's an efficient enforcer. Understood, Your Honor. Who's left standing. No, but your point, I think, is that if it was before the running of their statute of limitations, the other side might have a better argument that they were the more efficient enforcers. But now with the statute having run, they can't be enforcers at all, and therefore how can they be efficient ones? One of the efficient enforcer factors is you have to be motivated. How can you say that those are motivated plaintiffs if they haven't sued? There's a, you know, we quoted a well-spun phrase from a law review article that said that there would be an air of unreality about denying standing to someone who did sue in favor of someone who hasn't. It's not quite in favor of. I think it's sort of stepping back and asking whether someone in the position of your client is an efficient enforcer relative to all of the other actual and potential interests and players that are potentially involved. Well, again. I mean, what if they started the suit and then settled it for peanuts, or they decided that antitrust litigation is too expensive, which, of course, it is, and withdrew their suit? Would that make you more efficient or less efficient? Let me say this, Your Honor. If we were all together, if they had sued and we sued, then an expert would have to project what would have happened, what their market share would have been, what our market share would have been. You can find an expert to testify that the floor is the ceiling. Well, but that's what would have had to happen. There would have to be a projection as to what would have devolved and what would the profits have been of these respective players. That could be done, and that's what would be done. Is there a possibility that your client could intervene in the source one litigation? How are you going to get your – how would you – assuming if source one is successful, you end up claiming damages as a result of the conspiracy which is now established. It seems to me you're out of luck unless somehow you – if you're not permitted to go forward here, you'd be out of luck in getting any lost profit damages. Or could that – is there some way you could get it out of that litigation? If we can't pursue that in our own right, I don't believe there is, Your Honor. And that's why it's important that we be permitted to go forward. Again, there is – source, as Your Honor pointed out, and this is the DDAVP case, their damages are different. They're easily separable and they're easily segregable. So there's simply no reason why source one can't go ahead and prove its case, and there's no reason why we shouldn't be permitted to go ahead and prove our case and recover the damages that we've suffered. I did want to say one thing – a few more things, but one thing in particular. The red light's on, so I don't know. Well, we've kind of derailed your argument with a lot of questions. Is there one thing you want to add that makes a difference? Yes. I think it does make a difference. On the antitrust injury requirement, the policy implications of the decision below are really quite dire and really quite egregious. If that decision were correct, then a wrongdoer who drove out a first wave of competitors would then be immunized from liability from any subsequent competitors. I think what the Court is saying is that there's something indirect about injuries suffered by somebody who steps into a commercial environment that is already distorted by the antitrust misconduct of others. It's not like something that swooped down and happened to you. You stepped into it. I'm not saying that you have to suffer antitrust injuries. I'm just saying I think that's what the Court had in mind when the Court said that your business opportunity was to step into a market distortion. I think what the Court did not appreciate were the implications of the decision that it made. Well, it also relied on cases in which there was a continuing benefit. Precisely. And here, whatever benefit there was, was just the fact that you're entering the market. And then from that point on, at least according to your allegations, the benefit ceased. Right. Again, to address your comment, antitrust law is supposed to protect competition and deter wrongdoing. The effect of this decision would be exactly the opposite. It would be to protect the wrongdoing, to actually reward the wrongdoing with immunity and deter competitors. Because who is going to enter a market that's already infested with an antitrust conspiracy when the law has withdrawn its protection and the defendants are immunized? You've reserved three minutes, Rebuttal. Thank you. Thank you for your good answer. Good morning. May it please the Court. I'm Rick Godfrey. I'm appearing on behalf of the other two co-defendants, Benko and Patterson. Counsel, I'd like to ask a global question before you turn to your argument. Make sure I understand this case. Is this about the defendants here protecting a system of sales to dentists with individual salespeople as opposed to e-commerce? Is that what this is about? That is how the plaintiff would characterize it. The defendant's position is that they have a distribution system. A distribution system that does not involve e-commerce. Is that correct? Well, we're tied to the record here. I won't say that the defendants don't have an e-commerce platform, but we're tied to the record here. The record here is that Source One is the platform, the new innovative platform, that allegedly was targeted by the defendants as the subject of an antitrust conspiracy. Well, don't your clients not use e-commerce, but use individual visits to dentist offices? Isn't that correct? Well, they do, but I think that there's also e-commerce. It's just not part of this record. We don't have a similar platform like Source One, but it's not part of this record. I'm tied to the record, Your Honor. The record is that there's a dispute between which is the best way to distribute products. Now, I happen to. Your client has one way that. Correct. Costs more money. And provides more service. And the other side has a cheaper way, but you want to keep. And provides less service. Okay. But you want to fight e-commerce. Have you also thought of bailing out the ocean with a teacup? I didn't say we were fighting e-commerce. I'm simply saying I'm tied to the record before the court. The court is. Okay. So does Henry Schein offer things via e-commerce? I think the answer to that is yes, but that's not part of this record. I'm tied to the record before the court on it. Right. It's going to be sorted out in one of these litigations that go forward. Correct. If not this one, another one. Correct. So let's focus on this one. So let's focus. So what we have here is Associated General Contractors identified five factors in 1983. This Court, in implementing those five factors in the GATT communications test in 2013, created two imperatives. Imperative 1 and imperative 2. Imperative 1, as the Court knows, is whether or not there is a special kind of antitrust injury. And imperative 2, as the Court knows, is whether or not there is an efficient enforcer. Here, the judge mechanistically, carefully, and rigorously, Judge Kogan, having sourced one's own case before him, went through and found that step 2 of imperative 1 was not satisfied. He didn't even need to reach step 3, although if he had, we submit, and we've submitted this in our brief, he would not have, they would not have satisfied it. And he found that they did not satisfy the efficient enforcer test. Now, going to Your Honor's question, the but-for causation here, they would never have been on the source 1 platform at all, but for DDS, Arnold, and DHP. But what do you say to your adversary's argument that the district court's approach would essentially license antitrust, anticompetitive conduct by stripping his client and any successor to his client of antitrust protections? Well, it doesn't for two reasons. First of all, his client benefited because they never would have had access to the platform but for DDS. Arnold allegedly pressured off. But why is that? You can have three people. But why it matters is because if, as this goes to the question that Your Honor is asking, footnote 47 of Associated General Contractors says that if the more motivated partner parties, here Arnold or DHP or DDS, do not pursue it, it speaks to the validity of the claim. Okay. Then you're going to the second point. That's not a question of antitrust injury. That's a question of efficient enforcer. Well, I can see your argument on that basis better than the first one. I don't find this any different than Massachusetts, for example, where, you know, in a horizontal price-fixing conspiracy, a competitor does not have a claim because he's benefited or it's benefited by the increase in prices. He's not continually benefited. He gets in because there's a market distortion, and then he's nailed after that by the conspiracy because of all the activity against DHP. I understand the argument, but the reality here is they have pled the case in a specific way, and the pleading is but for the actions of the alleged conspirators. They never would have had the benefit of operating on the Source I program, period. That's how they've pled it. And it's not a question of, because going to Your Honor's question before, think about the poor district court judge here. If Source I sued and if DDS had sued and if Arnold had sued, DDS and Arnold aren't just suing up to the time that they were terminated or got out. They're suing for all their lost future profits. We'd have to you have to think about what kind of an opinion would you have us write here. I mean, in other words, if you get in by virtue of the market distortion, you then at that point are prohibited ever from being a plaintiff. I mean, that's essentially what, I guess, the rule that one would have to come up with, unless it's going to be a one-off rule. No, I would submit that this Court has already addressed and decided that question. Step two of GATT communications asks the question, is the plaintiff in a better or a worse position? The argument that you are postulating, and on behalf of, not on behalf of, but repeating on behalf of the appellant here, would mean that step two never can take place, because the same problem will always exist. Initially, they're in a better position, but as time goes on, allegedly they're in a worse position. So this is driven by GATT communications' question about step two. This isn't the appellant, the appellees here, coming up with a new argument. This is driven specifically by the formulaic application of associated general contractors as adopted by this Court. There are people who are benefited by the antitrust conspiracy who want to be plaintiffs, but they're getting, they are getting a continuous ongoing benefit. It's not a question of the threshold of getting into the market. And once they're in the market, it seems to me that it depends on where you draw the line. Do you start with the injury as of the time the person starts to be injured, or do you start before that? My answer to that would be in this case, based on the pleading that they filed before this Court, their complaint, they're going to get continuous benefit because they are now part of the source one platform where otherwise they would not be. Every dollar. And that's what the District Court found. The District Court found that every single sale made . . . Are you saying that they really have no right under the law or equity to do business in an environment that is not distorted? No, not at all. What I'm saying is if they want to have a different platform, if they start themselves or with someone else, they can do that. And if there's claims based on the antitrust laws, they can bring that case. But in this case, they pled their complaint in a very specific, factual way. And the District Court, Judge Kogan, properly found that based on the pleadings that they made in this case, every single sale that they have ever made and will make is solely because of the benefit they have received. That's the question asked by this Court in the GATT case, Step 2 of Imperative 1. But assume we're wrong. Assume that the Court says, well, at some point, there's got to be an antitrust injury here of a special kind. If several companies are targeted because of their product by a competing kind of product and various competitors drop by the wayside as a result of the economic stress caused by the market distortion, your argument would be that the others should be happy that they're targeted by anticompetitive activity because they get to absorb the business that had been done by the competitors who fell by the wayside. No, that's not my argument at all. My argument is that in the specific case before the Court, it is alleged that there is a market disruptive new platform called Source One that had exclusive arrangement with DDS and Arnold. They drop out. It was not offered to IQ Dental. It was offered to DHP. They declined because, allegedly, of pressure. And so the next person, IQ Dental, gets in line and they now have 90 percent of the Source One platform, they say. And as the district court said, based on those allegations, under step two of get, they fail. But if they get 90 percent of the Source One platform and the Source One platform is under siege, they're going to get 90 percent of less of what they would have gotten 90 percent of. And they would have gotten nothing but for the more efficient antitrust. If they didn't go into business, they wouldn't get anything. Right. Which really goes to your point, which is, does this really turn ultimately on the efficient? Go to the other one. Go to the other one. Right. Right. And on that one, there's a long list of parties. And I think both, Your Honors, asked the right question, which is, we have to wait for the statute of limitations to expire before we decide? No. There's a long list of people who are better situated. First of all, Source One is suing for lost profits. They say it's just the commissions, but that will work out in the wash as to what and how broad its claim is. Secondly, DDS. They say it's commissions. That's all Source One gets is commissions. Every transaction has a profit? Correct. And a commission. Well, we hope it has a profit. Yeah. But it has a – we're talking about different profits. Yes. So we have the dentists who are suing for the overcharge. We have Source One who is suing. We have Archer and White who's suing. Source One who's suing for profits on the commissions, right? Yeah, and the expansion. Limited to the commissions. Correct. Well, we can debate that, but, yes, I assume the commissions are limited. The record here is not as precise. But they're searching for lost profits on their business. Right. And DDS and Arnold and DHP all could have pursued those claims that they thought them worthwhile to pursue, and they did not for whatever reason. Now, Archer and White is pursuing a claim down in Texas. But why are they in the equation now? Well, I don't think you become a more efficient enforcer because the people better situated chose not to sue. That's not – that's contrary to the jurisprudence of this Court in the Gett case in footnote 47. The reason I cited footnote 47 from Associated General Contractors was for a reason. They made the same argument to the Supreme Court, and the Supreme Court said in 8-1, well, if they didn't sue, it's because – Well, if you settle with all the more efficient enforcers and leave the ones who are, by your lights, are less efficient out there to sue, you could still claim that they are inefficient enforcers, even though you can't name any more efficient ones that are still viable? Well, remember, the efficient enforcer test is a four-factor test. It's not just the identity of others. It's whether it's direct or indirect, and we know the problems there. It's whether or not the damages are speculative and remote on the chain of causation. Justice Holmes' great quote that at least in the context of damages, we seldom go beyond the first step. That's been true for more than a century, and it's particularly true in the antitrust laws. And then you have the question of apportionment and damages. So let's play hypothetical, because Your Honor asked the first half of what I wanted to ask the Court in terms of hypothetical. Let's assume Source One gets in there, and they go to trial, and they lose. Where does that leave IQ Dental? They're not going to say they're bound by that. They're not going to say they're bound by the Source One expert and his multi-step analysis. It depends on why Source One loses. Or jury finds that there's no conspiracy. Jury finds that there's – right? So what you have is you have a series of entities up the chain, more directly impacted, up the chain before IQ Dental. And what they're basically saying is, well, this one dropped out for settlement, that one dropped out because they didn't want to sue, that one dropped out, we're the last person standing, therefore we need to be the ones going forward. Well, they're not the last person standing. You have the dentist going forward on this. You have Archer and White going forward on this. You have Source One going forward on this. Sotomayor, dentists are not going to be able to claim lost profits for IQ Dental. They're claiming the overcharged. They're claiming the overcharged. I know that. Yes. IQ's claim for lost profits is lost under those circumstances, right? Well, except that it actually belongs to DDS, DHP and Arnold, but then you'd say or they would argue they're lost because they didn't sue under the statute of limitations. That's not the efficient enforcer test, because otherwise, if that were true, you would simply identify a person, last person standing. You wouldn't care about direct or indirect factor one. You wouldn't care about speculative test number two, number three. You wouldn't care about, you know, factor four in terms of apportionment of damages, et cetera. Let me ask you this. If it turned out that of these four factors, and I don't know which one I'm talking about, you prevail on one or you raise a significant question on one or two, what do we do? That's all I need. That's all. Then everything has to be reweighed, right? By the district court, correct? We would remand for the district court to reweigh these factors? The law is, as said by Gatt, or as interpreted by Gatt, applying associate general contractors, that you must find under all circumstances a special kind of antitrust injury that is direct. So factor one plus step one must be satisfied. Then the other three are weighing and then balancing. I don't see, based on this record, why you have to defer to the district court. The district court is going to have the same record before the district court does. You're not going to then take facts. Roberts. The district court knows a good deal more about this than we'll ever know. As you pointed out, it has the source one case as well. Well, it has 25 consolidated cases, the dentist cases, and it has the source one. It has the dentist cases as well? Yes, it does. That's why Judge Kogan, you know, with all due respect, he knows how to call balls and strikes. He's let the dentist case go forward. He's let the source one case go forward. He did not let the IQ dental case go forward. He is very deeply enmeshed in the allegations and the facts of these cases, and as I say, he knows how to call balls and strikes in terms of the fine mistakes. So the judge would be in a position to obviate the issue of inconsistent verdicts that you raised earlier? No, I don't think he'd be in a position to obviate it. I think his decision here. We still have to deal with the issues, the legal issues here, don't we? Yes, you do. I mean, we don't just decide a case by saying whatever the district court says. I can't say that better than Your Honor just said it. But going back to your point, when this district court judge who knows these issues says and finds in this case, I can't figure out why they can meet Factor IV on apportionment of damages because it mires me in all the following hypothetical serious problems, he's saying it based upon a very comprehensive understanding of the entire picture of, in Your Honor's phrase about the market. And what's our standard of review of the district court? It's de novo here. It's a 12b-6. This is de novo. It's what, I'm sorry? It's de novo. I mean, it's not. It's de novo. This is a 12. It's weighing of the factors. We're talking about the weighing of the factors. Yes. And he is weighing it with the knowledge he has, but this Court, as a court of appeals, you are de novo review. This is not, there's no formal deference paid to a district court judge in the sense that I can't. Well, ordinarily, if there's multiple factors to be weighed and we disagree in part with the district court, we would remand for the thing to be re-weighed, at least in the first instance, by the district court. This depends upon how the court writes its opinion, obviously, but in terms of how GATT, remember, GATT is somewhat of a mechanistic test, and, you know, if you find, for example, no antitrust injury of a special kind or no direct injury, then there's nothing to weigh because that's an imperative that must be satisfied. If you find that because of the statute of limitations and you're going to create a new, you're going to craft a new rule under GATT, which says basically last person or last entity standing, then you would say, well, where does that leave us in terms of factors 2 and 4? Because if factors 2 and 4, we still agree with the district court judge, it doesn't matter. So I take your point, but there are ways of, that I can hypothesize how an opinion could be written, where the proper outcome would be, we remand to the district  But on the record before this Court, the only factor that the plaintiff is arguing about is to create a new rule, which is last entity standing, and if the court were to create that rule, given the problems with factor 1, factor 3, and factor 4, then I would submit to the Court that that doesn't require a reway by the district court. Thank you. Thank you very much. I greatly appreciate the time. It's always a pleasure. Thank you, Mr. Rebuttal. Just to be clear on antitrust injury, and I think your Honors understand this, the problem with the district court's approach is that it focuses exclusively on how IQ got in, and ignores everything else that happened afterwards. Chronologically, there were two major boycotts of these dental association trade shows. The Texas boycott occurred almost simultaneously with IQ coming into this market and signing on. The Arizona boycott was in 2015. That happened after. All of the pressure on the manufacturers, that happened after IQ signed on. There was a National Dental Association meeting at which a number of states expressed interest, and then they all got scared off. All of that happened after IQ started selling through the market. So the conduct continued after IQ joined, and the injury occurred after IQ joined. On those facts, it's simply impossible to say that IQ was not injured. It's only this very narrowly restrictive view that it has to do with how you got in, under which that could be said. And there is precedent. We've just been told that this district court has a view of the entire litigation of all the dentist cases. So it does make a difference how IQ got in, doesn't it? I don't think how IQ got in is in any sense, certainly not somewhat relevant, but it's not close to being dispositive of the issue of whether it was injured. It was injured because there was a conspiracy to restrict the market that it entered, and as a result, the market didn't expand in the way it otherwise would have. It simply cannot be said that IQ was not injured. The district court said that IQ was in a better position once Source One folded, didn't they? Why is that not correct? So I think defendants, in all of their arguments, are over-reading the GATT case. What the GATT case says is that the second step of the antitrust injury analysis is to identify, quote, the actual injury the plaintiff alleges, unquote, by, quote, looking to the ways in which the plaintiff claims it is in a worse position, unquote, as a consequence of the defendant's conduct. So the plaintiff, under that rule, it's the plaintiff's allegations of how they were injured that need to be evaluated and compared to the prohibited conduct. And, again, to focus exclusively on how IQ got in is, first of all, it's unprecedented. And there is a case, the NCA v. Law case from the District of Kansas, that addresses exactly this issue. And what the court in that case said, in very, very comparable circumstances, again, the NCA was arguing that there were coaches who wouldn't have gotten their jobs but for this compensation cap that was imposed, and that, as a result, they weren't injured because they should be happy that they got jobs. And what the court said in the climactic sentence of its opinion was this, it does not matter why the latter got their jobs or how long they had held them, regardless of why the jobs were created or how recently those coaches had been employed, they were entitled to work in a market that was not infested with a conspiracy to violate the federal antitrust laws. So there's exactly one case that addresses this argument and the vastness of antitrust law, and it soundly rejects the argument that's being made. Thank you both. We will reserve decision.